## The People of the State of New York, Respondent, v Vincent Di Nicolantonio, Appellant.

Second Department, August 22, 1988

**APPEARANCES OF COUNSEL**

*Vincent Di Nicolantonio, pro se,* and *John F. Clennan* for Vincent Di Nicolantonio, appellant.

*John J. Santucci, District Attorney (Beverly Kalman* of counsel), for respondent.

**OPINION OF THE COURT**

Per Curiam.

There is no question but that the defendant's constitutional right to cross-examine the witnesses against him, guaranteed by the Confrontation Clause of the Sixth Amendment (US Const 6th, 14th Amends), was violated in this case *(see, Cruz v New York,* 481 US 186, 107 S Ct 1714, *on remand* 70 NY2d 733; *Bruton v United States,* 391 US 123). The critical

issue then is whether this violation of one of the most important rights guaranteed to a defendant in a criminal case *(see, Pointer v Texas,* 380 US 400, 404) can be overlooked, on the basis that there is no reasonable possibility that it affected the jury's verdict *(see, Chapman v California,* 386 US 18; *Harrington v California,* 395 US 250; *see also, People v Hamlin,* 71 NY2d 750; *People v Pitts,* 71 NY2d 923; *People v Crimmins,* 36 NY2d 230). Unlike our dissenting associates, we cannot dispel from our minds the opinion that the outcome of this trial would have been different had it been conducted in accordance with the mandates of the Federal Constitution. We therefore reverse the judgment of conviction and order a new trial.

The defendant was convicted, upon a jury verdict, of murder in the second degree (Penal Law § 125.25 [3] [felony murder]), four counts of attempted robbery in the first degree (Penal Law § 160.15 [1], [2]; § 110.00), criminal possession of a weapon in the second degree (Penal Law § 265.03) and criminal use of a firearm in the second degree (Penal Law § 265.08 [1]). The principal item of evidence adduced against the defendant at trial consisted of his pretrial statement to police. In this statement, the defendant admitted that he had accompanied three other men ("Rex", "Carlos" and "Joey"), whom he knew to have planned to "do a stick up" and whom he knew to be in possession of handguns, to the BVD Bar in Queens, New York. According to this statement, the defendant drove his three accomplices to the bar in his 1971 Pontiac Bonneville, observed them enter the bar, and, after their return a few minutes later, drove them away. According to the defendant's statement, it was his codefendant, Rex Rivera, who distributed handguns to the other men who entered the bar, and it was Rivera, who, upon their return to the defendant's car, admitted that he had shot an off-duty police officer.

The defendant was tried together with Rivera and Carlos Flores. This joint trial was held as a consequence of the Supreme Court's erroneous decision, over the defendant's objection, to grant a motion to consolidate which had been made by the People. At trial, transcribed pretrial statements which had been made by Rivera and Flores were admitted into evidence against them. There is no basis upon which they properly could have been admitted against the defendant. Flores's statement confirmed that of the defendant by identifying the defendant as the "wheelman" and by identifying Rivera as the perpetrator who intentionally shot the victim. Rivera, however, in his statement to police, claimed that it

was he who had been the "wheelman" and he identified the defendant as the actual killer. The admission of these codefendants' statements into evidence at the defendant's trial unquestionably constituted a violation of the defendant's right to confront and cross-examine the witnesses against him *(see, Cruz v New York, supra; Bruton v United States, supra)*.

In assessing the effect that this constitutional error might have had on the outcome of the trial, it is necessary to consider separately so much of the jury's verdict as convicted the defendant of felony murder and the weapons charges, on the one hand, and so much of the verdict as convicted him of four counts of robbery on the other. With respect to the felony murder and weapons convictions, we conclude that there is a substantial likelihood that the *Cruz-Bruton* error that occurred in this case may have tainted the jury's verdict. Although the harmless error question is closer with respect to the attempted robbery convictions, we conclude that a new trial is warranted as to these counts as well.

The defendant attempted to avoid a conviction of the felony murder charge by admitting to the jury, through his attorney, the truth of his own pretrial statement. The defendant admitted at trial that he knowingly aided in the commission of the attempted robbery of several patrons of the BVD Bar by driving the perpetrators to that location and by later driving them away from it. The defendant insisted, however, that his statement to police accurately shows, (1) that he was not the actual killer and did not aid in the actual killing, (2) that he himself was not armed with a deadly weapon or dangerous instrument, (3) that he had no reasonable ground to believe that any of the other participants in the robbery had such a weapon, and (4) that he had no reasonable ground to believe that any of the other participants intended to engage in conduct likely to result in death or serious physical injury. The defendant hoped, in other words, to have the jury accept the "nonkiller" affirmative defense to felony murder (Penal Law § 125.25 [3]).

The weight of the evidence adduced at trial, in fact, establishes the truth of the first, second and fourth components of this affirmative defense. The critical issue for the defendant, then, was whether there was sufficient proof as to the third component of this affirmative defense, that is, whether there was sufficient proof that he had no reasonable ground to believe that the other participants in the robbery were armed with deadly weapons. This was the issue upon which the

defendant's guilt or innocence of felony murder entirely hinged, and it is the effect which the trial court's *Bruton-Cruz* error may have had upon the jury's determination of the issue which is decisive on this appeal.

◼ The defendant in his transcribed statement indicated that it was Rivera who had distributed and who later collected the handguns which had been used in the robbery. There is nothing in this defendant's statement from which it could be inferred that the defendant actually exerted dominion and control over these weapons, or that he owned them. The factual, if not the legal, sufficiency of the evidence adduced in support of the weapons convictions is therefore not beyond question *(see, People v Quick,* 30 AD2d 561, *affd* 26 NY2d 773 [participation in underlying felony does not necessarily make a defendant guilty of possession of weapons used by others incidental to that felony]; *cf., People v Keitt,* 42 NY2d 926, *affg* 51 AD2d 1024; *see also, People v Restrepo,* 93 AD2d 825; *People v Vastola,* 70 AD2d 918), particularly in light of the heavy burden that the People undertake when relying on constructive rather than actual possession *(see, People v Roberson,* 41 NY2d 106, 109; *People v Lemmons,* 40 NY2d 505, 514). Since Rivera's statement to the police indicated that it was the defendant who had custody of the weapons, we cannot conceive of how the *Cruz-Bruton* error inherent in the admission of Rivera's statement can be considered harmless, at least insofar as the weapons convictions are concerned.

◼ Similarly, there is no direct evidence in the defendant's statement that he knew that the guns which he saw being displayed by his companions were loaded and operable so as to constitute "dangerous weapons". Importantly, at one point in his statement while describing the weapons he had seen, the defendant indicated that one of the weapons appeared to be "like one where a beebie would come out of" and stated that it appeared to have no "hole where a bullet would come out of". From this, a jury could infer that the defendant did not know the weapons were operable and there may be merit to the defendant's affirmative defense. We are of the opinion that the possibility that the jury might have acquitted the defendant on the basis of that affirmative defense would have been substantially greater had it not been for their awareness of the codefendant Rivera's claim that it was the defendant who produced the weapons. We cannot conclude that there is no reasonable possibility that the jury's verdict as to felony murder was unaffected by this error, and so, pursuant to the

proper standard for reviewing the harmlessness of constitutional error *(see, Chapman v California, supra; Harrington v California, supra; People v Crimmins, supra,* at 237), we find that the felony murder conviction must be reversed.

The cases relied upon in the dissent illustrate how a *Cruz-Bruton* error may generally be considered harmless where the defendant's own confession is equally or more inculpatory than that of the confessing codefendant, or where there is evidence unrelated to the defendant's statements which furnishes additional corroboration of the guilt *(e.g., People v West,* 137 AD2d 855 [three eyewitnesses, dying declarations of victim provided additional evidence of guilt]; *People v Ortiz,* 137 AD2d 727 [strong identification testimony]; *People v McCain,* 134 AD2d 287, *lv denied* 71 NY2d 899). In *People v Hamlin (supra)* for example, the Court of Appeals held that *Cruz* error could be deemed harmless where the defendant's own confession to intentional murder was corroborated by evidence that blood and hair samples consistent with the victim's were found on his clothes and by evidence that bloodstained money taken from the victim, and the murder weapon, were found in locations identified by the defendant. These cases do not focus on the possible effect which a *Cruz-Bruton* error might have on a defendant's proposed affirmative defense to felony murder. However, in one case recently decided by this court in which this was the principal issue, a felony murder conviction was reversed on the law *(see, People v Eady,* 134 AD2d 362).

In *People v Eady (supra)* the defendant was accused along with two others of having participated in a robbery during which a nonparticipant was killed. The confessions of the two codefendants were admitted into evidence and, according to one of these confessions, it was the defendant who had provided the gun later used by a codefendant to kill the victim. Correctly noting that such evidence tended to undermine the defendant's affirmative defense to felony murder, this court ordered a new trial as to the felony murder, while affirming the conviction for the underlying robbery. We can frankly see no valid distinction between the present case and *People v Eady (supra)* which would justify an affirmance of the defendant's felony murder conviction.

■ We are also of the opinion that, under the particular facts presented here, the defendant's robbery convictions should be reversed. Our satisfaction that his guilt of these crimes was proved, given his candid admissions to these crimes at trial, is not alone determinative of whether these

convictions should be permitted to stand. The test to be applied in deciding whether to affirm a judgment of conviction, which imposes criminal liability upon a defendant and which results in his loss of liberty, is not limited to deciding whether the judgment reflects an accurate assessment of the facts; rather, the test includes a determination as to whether the process by which the jury reached its verdict—however reliable it may be—was fundamentally fair. The Supreme Court has recognized that the Due Process Clause of the Fourteenth Amendment guarantees that a criminal defendant may not be tried in a manner which deprives him of " 'that fundamental fairness essential to the very concept of justice' " *(Payne v Arkansas,* 356 US 560, 567, quoting from *Lisenba v California,* 314 US 219, 236). In the words of Justice Harlan, "the requirements of the Due Process Clause of the Fourteenth Amendment must be respected, no matter how heinous the crime in question and no matter how guilty an accused may ultimately be found to be after guilt has been established in accordance with the procedure demanded by the Constitution" *(Chessman v Teets,* 354 US 156, 165).

The defendant's trial in this case was fundamentally unfair because there is a substantial possibility that his entire defense strategy, specifically the strategy of admitting the truth of his confession, was the result of the court's erroneous granting of the motion to consolidate his trial with those of Rivera and Flores. There is, as the dissent notes, no explicit indication in the record that the defendant adopted this desperate strategy because of the court's error. This, however, is immaterial. This court has on innumerable occasions reviewed claims of *Sandoval* error *(People v Sandoval,* 34 NY2d 371) on the merits, without insistence on a demonstration in the record that the *Sandoval* ruling had any effect on the defendant's decision whether to testify. It is, in effect, assumed for the purposes of appellate review that an erroneous *Sandoval* ruling affected the defendant's decision not to testify *(see, People v Williams,* 56 NY2d 236, 240-241; *cf., Luce v United States,* 469 US 38). Similarly, the Court of Appeals has held that since an erroneous pretrial order respecting the admissibility of evidence may be assumed to have had an effect on a defendant's decision to plead guilty, such orders should not be affirmed pursuant to the harmless error doctrine upon appellate review pursuant to CPL 710.70 (2) *(see, People v Coles,* 62 NY2d 908). By analogy, we think it may fairly be assumed in the present case that the risky trial strategy adopted by the

defendant was the product of the court's *Cruz-Bruton* error, and we therefore do not agree with the dissenters that the defendant's employment of that strategy may be considered conclusive with respect to the harmlessness of the *Cruz-Bruton* error. "Speculation about what the defendant might have done had the circumstances been different can never be more than just that—speculation" *(People v Williams, supra,* at 240-241). Since speculation as to whether the defendant might have adopted a different trial strategy had the *Cruz-Bruton* error not occurred is fruitless, we think that for purposes of appellate review it should be assumed that the error had such an effect, rather than assuming, as the dissenters apparently do, that it did not.

One final consideration must be expressed. We need not speculate as to what might be the ultimate outcome of the now pending appeal filed by the codefendant Rivera, the individual who by all indications in the present record was, as the jury found, the actual killer of the victim. We only note that a certain incongruity would develop if, as the dissenters argue, this defendant's conviction of felony murder and attempted robbery should be affirmed and if it should thereafter be decided on appeal that, because of the trial court's *Cruz-Bruton* error, Mr. Rivera is entitled to a new trial simply because, unlike the present defendant, he unsuccessfully attempted to repudiate his own confession *(see, People v Pitts,* 71 NY2d 923, *supra).* It would certainly appear most unfair if, as between two jointly tried codefendants, the obviously more culpable defendant should be afforded a new trial based upon the same claim of error which proved unavailing to the less culpable defendant.

In light of these considerations, we conclude that the robbery convictions of the defendant should also be reversed, together with his weapons convictions and his conviction of felony murder, and that a new trial should be ordered. We have examined the defendant's remaining contentions and find that they are without merit.

SPATT, J. (concurring in part and dissenting in part). While I agree with the majority that the holding of *Cruz v New York* (481 US 186, 107 S Ct 1714, *on remand* 70 NY2d 733) is applicable to this case, I find that the error in admitting the codefendants' confessions implicating the defendant at their joint trial was harmless as to the attempted robbery and murder convictions. Accordingly, in my view, a new trial is

not warranted on those counts. However, as to the defendant's convictions for criminal use of a firearm in the second degree and criminal possession of a weapon in the second degree, I agree with the majority that reversal and a new trial are necessary. The evidence of the defendant's guilt on the weapons counts was legally sufficient but not overwhelming and, therefore, the error was not harmless.

This case arises out of an attempted armed robbery of the BVD Bar in Queens, committed in the early morning of January 12, 1981. In the course of the robbery, an off-duty police officer was murdered.

At trial, the prosecution presented the testimony of eight people who were inside the bar at the time of the attempted robbery. They related that three masked men entered the bar brandishing guns and announced a holdup. A customer, off-duty Police Officer Robert Walsh, attempted to intervene and identified himself as a police officer, whereupon the tallest of the three perpetrators, who had remained near the front of the bar, repeatedly shot Officer Walsh. The last shot was fired into Officer Walsh's head at close range while he lay wounded on the ground. The shooter then directed his accomplices to leave and all three would-be robbers fled. One of the patrons followed the perpetrators and shot at the car in which they fled.

The prosecution also presented the testimony of the police detectives assigned to investigate this homicide. On January 13, 1981, they went to the defendant's home and asked to speak to him. The defendant voluntarily agreed to accompany the detectives to the precinct station house. As they were leaving, the defendant blurted out, "They're not going to put this on me. I'm not going to go for the cop killing. That's my car and that's the car we used and I was the driver of that car." This statement was not in response to any question posed by the detectives, who then advised the defendant that he was under arrest and read him his *Miranda* rights.

The defendant agreed to speak to the detectives without an attorney present; and, despite instructions to wait until they arrived at the station house, the defendant volunteered, "I didn't know it was going to be a robbery; I had nothing to do with the killing of the cop".

At the station house, the defendant made a full detailed confession of his involvement in the attempted robbery of the BVD Bar. He stated that on January 10, 1981, he and codefen-

dant Carlos Flores planned to commit a robbery the next evening. On January 11, 1981, he met Flores and Flores's girlfriend "Bambi", at approximately 3:00 P.M. Together they went rollerskating, had dinner and then went to a movie. After the movie, at approximately 9:30 to 10:00 P.M., they traveled in the defendant's car to Raffie's Bar on Gates Avenue and picked up the codefendant Jose Rojas. The defendant next drove to "Bambi's" house and dropped her off. Along the way, the three men discussed the robbery they were planning to commit.

The defendant then drove to Wilson Avenue and picked up codefendant Richard "Rex" Rivera. From there, they went to a grocery store where Rivera purchased a pair of women's stockings. In the car, Rivera cut the stockings and gave pieces to Rojas and Flores.

At approximately midnight, the defendant drove to the BVD Bar. Rivera had guns in a red plastic bag. He gave one each to Rojas and Flores and kept at least one and possibly two guns for himself. The defendant parked the car. The other three men got out, put the stockings over their heads and entered the bar.

Five to six minutes later, the three accomplices ran back to the car and jumped in. Rivera directed the defendant to get going and told him that he had shot a police officer. As he drove along Flushing Avenue, the defendant almost collided with a garbage truck. As they drove, Rivera collected the guns.

The defendant took Rojas and Flores back to Raffie's Bar on Gates Avenue. He then accompanied Rivera to the apartment of Rivera's "spiritual advisor". From there, the defendant drove Rivera back to the grocery store where Rivera had purchased the stockings. After Rivera made some purchases recommended by the "spiritual advisor," the defendant took him home. Rivera took the guns with him.

The defendant returned to Raffie's Bar where he had left Rojas and Flores. He then drove Rojas and another man to Bleeker Street to obtain marihuana. The defendant and Flores drove to Central Avenue, parked in front of the defendant's stepfather's store and slept in the defendant's car until 6:30 A.M. When they awoke, they drove to "Bambi's" house, but she was not home. They then went to a diner where they purchased breakfast and a newspaper. The story of Officer Walsh's murder was on the front page. The defendant then went home and told his stepfather what had occurred.

After confessing, the defendant took the detectives on a guided tour of the locations relevant to the crime. He showed them Raffie's Bar where he had picked up the codefendant Rojas before the robbery. He then showed the detectives two buildings on Wilson Avenue, stating that the codefendant Rivera had come out of one of the buildings. The defendant then directed the detectives to the location where he had dropped off "Bambi".

Also admitted into evidence at trial was a tape-recorded confession made by the defendant on January 14, 1981, to an Assistant District Attorney. The defendant again admitted to planning the robbery and knowing that the codefendants were armed with guns when they entered the bar. Indeed, the second confession was even more detailed than the first.

In determining whether *Bruton/Cruz (Bruton v United States,* 391 US 123; *Cruz v New York,* 481 US 186, 107 S Ct 1714, *on remand* 70 NY2d 733, *supra)* error is harmless, a reviewing court may, of course, consider the defendant's own confessions. The Supreme Court stated in *Cruz:* "Of course, the defendant's confession * * * may be considered on appeal in assessing whether any Confrontation Clause violation was harmless" *(Cruz v New York, supra,* 481 US, at —, 107 S Ct, at 1719).

It is difficult to imagine a more damning series of confessions than those made by the defendant in the instant case. The confessions were comprehensive and fully voluntary *(see, People v West,* 137 AD2d 855; *People v Ortiz,* 137 AD2d 727; *People v Glover,* 139 AD2d 530; *People v McCain,* 134 AD2d 287, *lv denied* 71 NY2d 899).

In addition to the defendant's confessions and the tour he provided the police, the prosecution offered at trial the testimony of Vilma Maldonado, also known as "Bambi". Ms. Maldonado related, in accord with the defendant's confessions, how a robbery was planned in the defendant's car on the night of January 11, 1981.

Other details of the defendant's confession were confirmed by independent evidence admitted at trial. A fingerprint identification expert testified that the codefendant Flores's fingerprint was found on a window of the defendant's car. Raymond Martinez testified that at approximately 7:00 A.M. on January 12, 1981, the codefendant Rivera, who was his next door neighbor, gave him a gun. On January 14, 1981, Martinez turned the gun over to a police detective. Two ballistics

experts testified that the gun was the murder weapon, thus confirming the defendant's statement that Rivera took the weapons with him after the crime.

Joseph Russo testified that while he was driving a sanitation truck on Flushing Avenue near 55th and 56th Streets at approximately midnight on January 12, 1981, his truck was nearly struck by a passing car. At trial, he viewed a photograph of the defendant's car and testified that it looked like the car which nearly collided with his garbage truck. Mr. Russo testified that a day or two after the crime, at the request of the police, he viewed the defendant's car at the police station and identified it as resembling the car which almost struck his truck. On the night of the incident, he had noticed a man running after the car.

In the face of this evidence, the defendant asserted that he lacked the prerequisite intent to establish intentional murder and interposed the statutory affirmative defense to felony murder (see, Penal Law § 125.25 [3] [a], [b], [c], [d]). In order to prevail on the statutory defense, the defendant had the burden of proving, by a preponderance of the evidence, that he did not commit or aid in the commission of the homicidal act, that he was not armed with a deadly weapon and had no reasonable ground to believe that any other participant was either armed with a deadly weapon or intended to engage in conduct likely to result in death or serious physical injury (Penal Law § 125.25 [3]; *People v Bornholdt,* 33 NY2d 75, *cert denied sub nom. Victory v New York,* 416 US 905). The defendant's choice of trial strategy involved express reaffirmance of his confessions by defense counsel in his opening statement and summation.

This strategy of admitting participation in the attempted robbery had the practical effect of limiting the contested factual issues. The defendant asked the jury to credit the testimony of the police detectives and the Assistant District Attorney relating his confessions. The absence of any challenge to the existence or substance of the confession contributes to the determination of the harmlessness of the error alleged on appeal (see, e.g., *People v Smalls,* 55 NY2d 407, 417; *People v Santanella,* 63 AD2d 744, 746-747, *cert denied sub nom. Tamilio v New York,* 443 US 912).

Significantly, there is no indication in the record that the defendant believed himself constrained to reaffirm his pretrial confessions by the admission at trial of the codefendants'

confessions implicating him. Clearly, the choice of reasonable defenses was severely limited by the defendant's own repeated, detailed confessions. The defendant's counsel did not object to the joint trial on the ground that it forced the defendant to stand by his confession; rather, the objection was grounded on the conflict between the defendant's and Rivera's confessions as to who was the driver of the car and who was the shooter. However, the jury obviously did not consider Rivera's confession against the defendant because the defendant was acquitted of the intentional murder charge while Rivera alone was convicted of intentional murder. This fact distinguishes the instant case from *People v Eady* (134 AD2d 362), relied on by the majority.

With respect to the affirmative defense, we agree with the majority to the extent that the weight of the credible evidence established two of the components of the statutory affirmative defense; i.e., that the defendant was not the actual shooter and was not armed with a deadly weapon. However, the defense was weak with respect to the remaining two components; i.e., that he had no reasonable ground to believe either that any of the other participants were armed with a deadly weapon or dangerous instrument or that any other participant intended to engage in conduct likely to result in death or serious physical injury (Penal Law § 125.25 [3]). The weakness of the evidence as to the latter two components is not attributable to the codefendants' confessions. Rather, it is a result of the defendant's own confessions in which he admitted that he knew that his fellow would-be robbers were armed and intended to hold up a location where a number of people were likely to be present. The defendant's statement that one of the guns appeared to be a beebee gun accounts for only 1 of 3 or 4 weapons. The defendant, by reason of his own exhaustive admissions, failed to meet his burden on the affirmative defense *(see, People v Brailsford,* 106 AD2d 648, 649).

In *Cruz v New York (supra),* decided five years after the rendition of the judgment of conviction in this case, the United States Supreme Court overruled the plurality holding of *Parker v Randolph* (442 US 62). The Supreme Court held that the admission at a joint trial of a codefendant's confession implicating the defendant constituted a deprivation of the Sixth Amendment right to confront and cross-examine witnesses regardless of whether the defendant had made an "interlocking" confession.

In *Cruz,* the defendant sought to avoid his confession which

was made to a civilian by seeking to establish that the civilian had a motive to falsely implicate the defendant. In this circumstance, the Supreme Court held that the codefendant's interlocking confession was "enormously damaging". The Supreme Court then went on to state: "It might be otherwise if the defendant were *standing by* his confession, in which case it could be said that the codefendant's confession does no more than support the defendant's very own case. But in the real world of criminal litigation, the defendant is seeking to *avoid* his confession—on the ground that it was not accurately reported, or that it was not really true when made" *(Cruz v New York, supra,* 481 US, at —, 107 S Ct, at 1718).

The instant case is one of the admittedly rare "real world" criminal cases in which the defendant explicitly chose, as a matter of strategy, to stand by his confessions at trial. Neither the fact that the confessions were made nor their accuracy was challenged. As such, reversal of the felony murder and attempted robbery convictions on Sixth Amendment grounds is unwarranted *(cf., People v Pitts,* 71 NY2d 923 *[Cruz* error not harmless where the codefendants' confessions characterized the defendant's role in the crimes as central and instigating, and the defendant challenged the voluntariness of his entire confession]; *People v Wang,* 140 AD2d 567, 569 [admission of the codefendants' statements was "devastating to the defendant's attempt to renounce his own statements"]; *People v Latif,* 135 AD2d 736 [the defendant testified at trial denying participation, disclaiming alleged confessions to a prosecution witness and suggesting motive for that witness to lie]; *People v Martin,* 139 AD2d 599).

The record is replete with unequivocal examples of the defendant's plea to the jury to accept his confessions and, on the basis of those confessions, to find that he had proved both that he did not intend to kill Officer Walsh as a defense to the intentional murder count and the statutory affirmative defense to felony murder. In his opening remarks to the jury, defense counsel stated:

"My client is guilty of attempted robbery, of the four counts of attempted robbery. He is guilty of two possessions of weapons charges. In fact, [the defendant] fully cooperated with the police. From the first moment when he came in contact with the police, to the time that he gave the police a voluntary confession, which was later taped in the presence of an assistant district attorney, and I fairly much agree with the facts as they were stated to you by [the prosecutor] * * *

"I'm going to ask you to look at the evidence as to the first count, which is murder in the second degree, what we refer to as intentional murder.

"I submit to you that from the evidence there will be no evidence that [the defendant] intended to kill anyone; [the defendant] was outside in a car. [The defendant] did not have a gun * * *

"[The defendant] will show you by way of defense to that charge of what's called felony murder, that number one, he did not commit that homicidal act, nor aid in that homicidal act.

"Yes, he may have aide[d] in the commission of the attempted robbery, but not in the aiding *[sic]* of the homicidal act.

"Number two, he was not armed with a deadly weapon, nor any weapon. And I think it will be clear from the evidence that's adduced by the District Attorney that he was in the car without any weapon.

"Number three, the evidence will show that he had no reasonable grounds to believe that any of those guns were loaded and operable * * *

"And number four, he had no reasonable ground to believe that one of the other individuals would shoot anyone in that bar * * *

"[S]ome of the first words that [the defendant] spoke to the police, 'They're not going to lay this rap on me. I didn't do this cop killing'. And in his mind he knew he was guilty of the attempted robbery, and he fully cooperated with the police and gave his statement to the police".

Consistent with the strategy laid out in his opening statement, the defendant's trial counsel's cross-examination of the detectives and the Assistant District Attorney was brief and focused on establishing that, after his arrest, the defendant cooperated fully with the law enforcement officials. Defense counsel also utilized cross-examination as an opportunity to emphasize that in his confessions, the defendant always maintained that he was unarmed, did not enter the bar and did not shoot anyone. In cross-examination of the patrons and employees of the BVD Bar, the defendant's attorney reestablished that only three robbers entered the bar, and that the shooter spoke to the accomplices in either Spanish or with a Spanish accent. Defense counsel also sought to emphasize the execu-

tion-style of the final shot, clearly implying that the shooter acted intentionally and not in furtherance of the robbery.

Continuing along these same lines, the defendant's trial counsel argued in summation:

"As I told you in my opening statement when I first spoke to you, [the defendant] admits that he participated in the planning of the robbery. I said that to you then. I say that to you now. I have not changed that position and [the defendant] has not changed that position. I also said to you back in January of this year that it was [the defendant's] position that he was the driver of the car that was outside, parked around the corner from the BVD Bar. I said that to you then, and I say that to you now * * *

"My first argument why you should accept the fact that [the defendant] was the driver, is that [the defendant] says he's the driver based upon his taped statement that is here before you in evidence.

"[The defendant] has been called cooperative throughout this entire trial. I submit to you why the police are calling him cooperative is because he was truthful. An untruthful individual is not a cooperative individual. The reason why he was cooperative is because he was truthful. *And I submit to you his statement was truthful. And I am not arguing for one moment that that statement is not the truth. I submit to you [that the defendant's] statement is, in fact, the truth"* (emphasis supplied).

It is, therefore, beyond question that the defendant wished to convince the jury of the truthfulness of his confessions. In this regard, the United States Supreme Court in *Cruz (supra)*, commented: "Quite obviously, what the 'interlocking' nature of the codefendant's confession pertains to is not its *harmfulness* but rather its *reliability*: If it confirms essentially the same facts as the defendant's own confession it is more likely to be true" *(Cruz v New York, supra,* 481 US, at —, 107 S Ct, at 1718).

In this case, the defendant's defense was contained in his confessions, and he sought to establish their reliability. Consequently, the codefendants' confessions, to the extent that they interlocked with the defendant's confessions, actually aided him in advancing his defense. The confession of the codefendant Flores confirmed that the defendant was the unarmed driver of the getaway car. Rivera's confession conflicted with the defendant's version of the event in two regards. First, he

identified the defendant as the shooter. However, this accusation was clearly rejected by the jury *(see, People v Larmond,* 139 AD2d 668 *[Bruton/Cruz* error harmless despite the fact that the nontestifying codefendant's statement attributed sexually abusive behavior to the defendant not contained in the defendant's statement]). Second, Rivera identified the defendant as the supplier of the guns used in this crime. Because the defendant's confessions did not include any mention of possessing or using the weapons, I agree with the majority's conclusion that a new trial on the weapons counts is necessary.

Recently, in *People v Hamlin* (71 NY2d 750, 758) the Court of Appeals provided the following instructive language with respect to the application of harmless error analysis in cases of *Bruton/Cruz* error: "When considering harmless error in a *Bruton* case, the court must determine on the basis of its own reading of the record the probable impact of the codefendant's admissions on the 'minds of an average jury' and whether they were sufficiently prejudicial to defendant to require reversal of the conviction and a new trial *(see, Harrington v California,* 395 US 250, 254). In making that assessment, we consider a number of factors, including how comprehensive defendant's statement is and whether it satisfactorily explains his or her part in the crime without reference to the codefendant's statement, whether it is corroborated or contradicted by other objective evidence, and whether defendant has reiterated it on one or more subsequent occasions *(see, Schneble v Florida,* 405 US 427, 431, *supra).* If the defendant has repudiated the confession, a similar, detailed statement by a codefendant may be particularly prejudicial to the minds of a jury instructed to decide whether defendant's statement was voluntary *(see, Cruz v New York,* 481 US, at —, 107 S Ct, at 1718, *supra; People v Pitts,* 71 NY2d 923; *cf., Schneble v Florida, supra)."*

Applying this standard, the Court of Appeals affirmed Hamlin's conviction based upon his "detailed, complete and internally consistent" written confessions which were confirmed by objective evidence *(supra,* at 759). By contrast, the court reversed Brown's conviction, finding that the admission of the "interlocking" codefendants' confessions were not harmless because Brown expressly repudiated his confession in his trial testimony, and, without his confession, the evidence was not sufficient to support the jury's verdict.

In this case, the defendant's repeated, detailed and inter-

nally consistent confessions, one of which was tape recorded, together with his guided tour of the crime route and the independent evidence of guilt provided by Ms. Maldonado fully implicating the defendant in the attempted robbery, as well as the testimony of Russo, Martinez and the fingerprint and ballistics experts corroborating details of the defendant's confessions, constituted overwhelming evidence of guilt of felony murder and attempted robbery which rendered the error in admitting the codefendants' confessions harmless beyond a reasonable doubt.

There is no reasonable possibility that the jury would have acquitted the defendant of felony murder or attempted robbery but for the erroneous admission of the codefendants' confessions *(see, People v Falu,* 138 AD2d 510, *lv denied* 71 NY2d 1026; *People v Baptiste,* 135 AD2d 546, *lv denied* 70 NY2d 952; *People v Williams,* 136 AD2d 581; *People v Reed,* 136 AD2d 577; *People v Galloway,* 138 AD2d 735, *lv denied* 71 NY2d 1027; *cf., People v Latif, supra,* at 739 [error not harmless where the confessions which were denied by the defendant at trial, were "the only evidence admissible against the defendant which directly linked him to the crime"]; *People v Rodriguez,* 138 AD2d 643; *People v Ray,* 140 AD2d 380). As a result of the defendant's deliberate choice of defense, the error in admitting the codefendants' confessions was not "devastating" *(Cruz v New York,* 481 US 186, —, 107 S Ct 1714, 1718, *supra);* indeed, under the facts of this case, the prejudicial effect with respect to the felony murder and attempted robbery charges was harmless. Therefore, the judgment of conviction should be modified by affirming those counts and vacating and directing a new trial on the convictions for criminal possession of a weapon in the second degree and criminal use of a firearm in the second degree.

BRACKEN, J. P., BROWN and SULLIVAN, JJ., concur; SPATT, J., concurs in part and dissents in part and votes to modify the judgment appealed from by reversing the convictions for criminal use of a firearm in the second degree and criminal possession of a weapon in the second degree, by vacating the sentences imposed thereon, and by ordering a new trial on those counts, and to affirm the judgment as so modified, in an opinion in which RUBIN, J., concurs.

Ordered that the judgment is reversed, on the law, and a new trial is ordered; the facts have been considered and are determined to have been established.